FILM TRANSIT, INCORPORATED, *v.* SAM K. CARSON, COMMISSIONER, ETC. (two cases).

(*Nashville,* December Term, 1955.)

Opinion filed February 3, 1956.

JAMES C. HAVRON, of ·Nashville, for appellant.

GEORGE F. McCANLESS, Attorney General, ALLISON B. HUMPHREYS, Solicitor General, and MILTON P. RICE, Assistant Attorney General, for appellee.

Mr. Justice Prewitt delivered the opinion of the Court.

These two causes were filed against the Commissioner of Finance and Taxation of the State of Tennessee, seeking a recovery of gross receipts taxes paid under protest, totalling $2,940.03.

The taxes in question were levied pursuant to Code Section 1248.134, Item O(a), which reads in part as follows:

"Each person engaged in the business of operating a transportation company shall, for the privilege of doing such business, pay to the state for state purposes an amount equal to three per cent. (3%) of the gross receipts derived from intrastate business in this state.

\* \* \* \* \* \*

"When transportation companies are operating partly within and partly without this state, the gross receipts shall be deemed to be all receipts on business beginning and ending within this state, without entering or passing through any other state. It is the intention of this item to levy a tax for the privilege of engaging in intrastate commerce carried on wholly within the state and not a part of interstate commerce."

It is insisted by the Film Company that the revenue received from the transportation of motion picture films from Memphis to theaters in the State of Tennessee con-

stitutes receipts derived from interstate commerce, or a part of interstate commerce.

Defendant insists that the films transported by the Company come to rest in Tennessee, and are stored in special fireproof exchange buildings in this State so as to take it from interstate commerce.

In order to understand the question to be decided it is well that we make quotations from some of the testimony introduced on the trial of the cause by the complainants. We refer to the testimony of G. W. Simpson, one of complainant's employees, concerning the way in which the films were handled at the Memphis exchange, he testified in part as follows:

"Q. When they are received at the exchange, I believe you said that they were inspected? A. That's right.

"Q. What does that consist of? A. That consists of what we call rewinding, and by an inspectoress, to see that the print is in good running order, and a seal is put on it.

"Q. What character of seal? How is that sealed? A. With just a small gummed piece of paper.

"Q., With an inspector's mark on it indicating what? A. Indicating it has been inspected.

"Q. It is necessary that that film be stored and kept under particular circumstances and conditions in order that it may be kept in good condition and kept safely? Is any special storing arrangment necessary? A. Yes, you have to have it in a fire proof building.

"Q. And when the film arrives it is stored there in a fireproof arrangement for its safekeeping; is that correct? A. Yes, sir.

"Q. Those prints, I believe you say, are kept under fireproof conditions, and then the salesman will see the exhibitor and he will tell him what prints he has available. And the exhibitor will arrange to rent or lease those prints to show on dates that they are available from the exchanges? A. That's right.

"Q. Does the exhibitor ever come to the exchange and view the picture before he rents or leases it? A. He has the right to do so.

\* \* \* \* \* \*

"A. That is accomplished in two ways, either exhibiting it in Memphis at a theatre or at what they call a screening room, or the print is sent to his theater so that he may inspect it himself.

"Q. At a time a print arrives in Tennessee, the particular destination isn't known except its destination is the exchange and then to such exhibitors as will rent it; is that true? A. That is right.

"Q. You spoke a while ago of films lasting on the circuit from six to twelve months, and then on their final return being, as you expressed it, jumped and sent back to the producer, I wish you would explain what you mean by that. A. Well, when a print is shipped from the producer and received by the distributor in Memphis, they take it for granted that it is played in all the theatres in the territory. However, they don't play it in all the theatres. Some of the exhibitors elect not to run certain prints and they have the privilege of rejecting them. On the ones that they do run, it is prepared, inspected and shipped to cover the play date designated and agreed on by the exhibitor and the distributor. After it has finished such engagements or apparently there will be no further use of it in the territory, a final in-

spection is made of the print and in accordance with instructions received from the producer it is returned to him wherever it may be.''

We agree with the Chancellor that, taking this testimony and the entire testimony introduced below, we find that the films in question did come to rest in Tennessee, and therefore the interstate character of the shipment ceased.

. The facts of this case bring it under the ruling of this Court in the recent case of *Buchanan* v. *Carson,* 188 Tenn. 420, 220 S. W. (2d) 115.

We have considered the assignments of error, find them without merit and affirm the decree of the Chancellor. :